Last case for the morning is Easter v. Hartford Life and Accident Insurance, 21-4106. Counsel for appellant, if you'd make your appearance and proceed, please. Thank you, Your Honor. Kenneth Grimes appearing for the appellant, Audrey Easter. In the Rasnack case, this court held that a plan administrator, an immersive plan administrator, improperly disregarded the claimant's evidence of paralysis. The Rasnack case followed this court's previous decision in Rextat, in which this court held that a plan administrator improperly failed to consider affidavits submitted by the claimant, and this court's previous decision in Gaither, in which this court held a plan administrator improperly failed to consider the claimant's pain medications. Those cases also followed this court's previous decision in the Caldwell case, in which this court held that the plan administrator improperly failed to consider the claimant's heavy lifting duties. In each of these cases, the plan administrator improperly failed to consider evidence that was before it in the administrative record. It was not sufficient that the plan administrator mentioned the evidence in his decision. The plan administrator was required to actually address the substantive merits of the claimant's relevant evidence. And this must be the rule, because otherwise, no matter how compelling the claimant's evidence of disability might be, the plan administrator could simply mention it in his decision and then ignore it and reach a contrary decision. And we believe that's essentially what happened in this case. Hartford states that it did consider Ms. Easter's evidence of disability at the initial denial level, but Hartford's initial denial level letter contains no reference to Easter CFS, or chronic fatigue syndrome, as a disabling condition. I thought it did mention. Excuse me? I thought it did mention. I looked at the initial denial, and I'm pretty sure it did reference it, didn't it? It did not, Your Honor. It made one mention that Easter had received treatment for CFS in the past when listing her medical records. But then when discussing her disability, it does not mention the CFS. And, in fact, if you look at the language of that initial denial, Easter CFS is actually excluded from the list of her physical conditions. It refers to Easter's physical conditions, including her insomnia and sleep disorders, and excludes any mention of her CFS. And then it doesn't talk about her CFS at all. It does not mention any of Easter's evidence supporting her CFS, including her primary treating provider, which was Megan Sandy. It doesn't mention her at all or her evidence. I mean, it mentions it in the medical. This is the issue I was just addressing. It's briefly mentioned in passing in the medical evidence, but then when it comes to actual discussion of the disability, Ms. Easter's CFS was not discussed at all. And nor did they contact her primary treating provider. What would you require? Because certainly Hartford did speak to those providers and got information from them, and even probably more direct information than Ms. Easter got. What exactly would satisfy you there? Well, there's two stages of the administrative process. The first stage is the initial denial stage. And at that stage, they did not talk to Megan Sandy, who was the primary treating provider for CFS. And they knew about Ms. Sandy because Megan Sandy had provided the initial attending physician statement, clearly stating that CFS was the primary disabling condition. They did not talk to her at all. Instead they talked to Megan Jones, who had just recently started treating Ms. Easter for sleep disorders. And at that point, sleep disorders had not even been diagnosed. This was to see if she had sleep disorders. But she had only started treating. So Hartford didn't talk to Megan Sandy at all, did not address Easter's self-reported limitations. And she didn't just talk about her disability, but her functionality. In her interview with Hartford, Easter talked about the fact that she slept to 12 to 14 hours, or 14 to 16 hours a day, that she couldn't get up before noon, that she was falling asleep at work. She addressed her inability to do her job, her functionality. This wasn't just a matter of I have a disability. It was a matter of I can't do my job. And she informed Hartford of that, and Hartford never addressed any of that. That's not mentioned in either the initial denial or the appeal denial. The independent medical examinations, and I think this is getting to your question, Your Honor, the independent medical examinations that were obtained by Hartford on appeal. Now, here's the problem. Because Hartford didn't address the CFS at the initial denial stage, Easter was denied an appeal on that issue. One of the reasons for, probably the main reason for the requirements at the initial denial stage has to be a written statement which specifically identifies the reasons for the decision in a manner that could be calculated by the claimant. And they also have to identify any additional information that they might need to decide the claim. One of the reasons for those requirements is so that the claimant can pursue an administrative appeal, and that administrative appeal will mean something. Easter was completely deprived of appeal on the issue of her CFS, which was the main issue in the case, by Hartford's failure to address that in the initial denial letter. I don't understand that. If she's claiming that CFS is her disability, and for whatever reason she feels that the initial determination was defective for not fully addressing that, why can't she claim in her appeal that problem? I mean, what is she denied by being able to do that? Well, she did claim that in her appeal, but she didn't have any decision from Hartford to respond to at that point. It wasn't until after the appeal was filed that Hartford then obtained the medical evaluations, which again, Ms. Easter had no opportunity to respond to. So that's what she was deprived of. But if Hartford had addressed the merits of Easter's CFS issues at the initial denial level, then Easter would have been advised of that and could have addressed those issues at the appeal stage. I guess my point is nothing stopped her from addressing it, whether Hartford talked about it or not. She still had an opportunity to make her case on appeal for overlooked evidence, right? I mean, that's what you're doing now, saying that they didn't talk to Sandy. They didn't do this. They didn't do that. Why couldn't you do that in the context of a case of appeal? She did to a degree, Your Honor, but on appeal, Ms. Easter did not have the benefit of knowing what Hartford's initial position was going to be. For example, Hartford didn't raise any issues regarding credibility. There's nothing there about, oh, well, we don't believe Easter's self-reported symptoms. Nothing about that in the initial denial letter. There's nothing about that in the appeal denial either. The appeal denial, the issue of credibility only came up after litigation commenced. Now, it's true that Dr. Duff, in his neurological exam, said that Easter, you know, was exaggerating her psychological conditions, but Dr. Duff did not address Easter's CFS. He was limited to a neuropsychological perspective, and he did discuss Easter's cognitive impairments, which can be relevant to CFS, and he did find that Easter had cognitive impairment, including severe impairment of manual dexterity and phonemic fluency. But Duff did not address the CFS at all. He's only finding, with respect to CFS, was that he could not tell if Easter's CFS was the cause of her cognitive problems. Okay. Let me ask you, use that as a segue to ask you this question. Let's assume for the moment we're under the arbitrary and capricious standard. We're not that they aren't deprived of that. Let's assume that for the moment. If that is the case, and the way it ends up is you say, there is not conclusive proof. They can't show that CFS did not cause this. Okay. In other words, let's assume there are two plausible explanations, and one explanation is CFS is the cause of her disability, but it can't be conclusively shown to be the cause of her disability, and there's evidence to the contrary. Under an arbitrary and capricious standard, you lose, right? I think given that scenario, Your Honor, but that's not the scenario that we have. I think what we have in this case is we have significant evidence supporting Easter's disability for CFS and no conflicting evidence. Because all the conflicting evidence that is argued by Hartford is not accurate. Let me reframe it then, because maybe I didn't ask it the correct way. Is it the fact that you cannot conclusively show that CFS caused the disability, if the burden is on you to show that, and their examination indicates that there could be other reasons we can't show that this CFS is the cause of the disability, isn't that enough for them to say that we're going to deny it? Because no expert tells us definitively that this causes it, certainly not in the two subsequent inquiries that they did for the appeal. Therefore, we make our judgment that disability is not applicable to CFS. First of all, I don't know that the claimant's standard is to conclusively establish. I think she needs sufficient evidence from which a conclusion can be made that she's disabled because of CFS. Now, whether that's sufficient or not depends on how the insurer handles that information. I disagree, however, with the proposal that Hartford presented alternative explanations for how this might have occurred. They might have articulated some, but they didn't prove any. There's no medical evidence showing that Easter's disability is due to anything other than CFS. Well, didn't Dr. Duff question her credibility? Well, he did question her credibility and whether she was overstating her symptoms. And I think there was other further evidence in the record that someone else suggested that they couldn't explain her presentation, her explanation of symptoms by virtue of the objective facts that they determined to be in the truth. That's referring to Dr. Blavis' peer evaluation. What he did was he called Easter's treating physician, Maine Sandy and Megan Jones, and we discussed those conversations in our brief to some extent. The attributed comment to Megan Jones was, I believe that this has got more to do with her mental illness than sleep disorders. But the very next sentence Megan Jones supposedly said, but I don't know to what extent CFS contributes to this. Bingo. That's the point I'm making. If all you end up with is, I don't know the extent that CFS contributes to this, and you're under an arbitrary and capricious standard, why don't you lose? I mean, if you have people saying, well, you know, the medical evidence doesn't square up, and I don't know, maybe it caused it, but I'm not sure it caused it, why under that standard can't the decision makers say, well, I haven't seen enough sufficient evidence, substantial evidence to support this? Your Honor, when there is conflicting medical evidence or vocational evidence in the file, you bet. The insurer can make that kind of a decision. But there's not that kind of conflicting evidence. We have substantial information from Megan Sandy primarily, who's the primary care provider, with respect to CFS saying this was the cause. We have no evidence which says otherwise. We have some speculation that she's got, we have acknowledgement that there were some other factors. For example, she does have some psychological issues. But according to Megan Sandy and Easter herself, those were being managed by medication before she ever started her work at IHC. Those were being managed. It was after her CFS flare-up that she was then unable to work. And her problem with being unable to work was that she couldn't stay awake. She was falling asleep at work. She even tried to work, reduced work schedule in order to, and that wouldn't work either. She was falling asleep. What about Sandy? Excuse me, counsel. Excuse me. What about Sandy and Jones as far as the flexibility? And they were saying she needs a more flexible schedule, as though she indeed can work. She just can't have nights and days and then nights and days. So long as she gets daytime, she's okay. Or does that fit into the whole chronicle? Exactly. I mean, Hartford failed to follow up on that at all to determine what kind of flexibility was needed, what kind of flexibility would be available from her work. Now, they called Megan Jones and said, well, what do you mean by flexibility? Megan Jones said, well, I don't know. I haven't seen her for two months. Then they didn't call Easter. My point is that doesn't sound quite like the chronic fatigue syndrome that you're describing. They're talking about her being able to function at least if she has a normal schedule. Well, we don't know what Megan Jones meant by flexibility. She said flexibility in the work schedule. Sure, flexibility in the work schedule might help somebody like Audrey Easter if she only has to work four-hour shifts, but she had to work 12-hour shifts. We don't know if there was any kind of other flexibility that was available. But the important part at the initial denial stage is that they failed to follow up with Easter or Megan Sandy to determine any kind of flexibility, what kind of flexibility would be available. They avoided discussion of the CFS at the initial denial level and at the appeal level. Thank you. I'm going to ask you one more question. I know your time's up, and if we need to allow a little time on the other side, we'll do that. My question relates to METSGR, that decision. And the question I have is this. In terms of that case's interpretation of the regulation, one way you could read that case, not the only way, but one way you could read that case is it conditions the delivery of medical reports after the appeal determination on the existence of conditions that there not being reports where there's new evidence and there not being novel theories. In other words, if there's reports with new evidence or novel theories, you have to give those reports before the appeal decision. Are you following me? Yes, that's our position. Okay. Well, my point is in the context of this case, were those conditions, either one of those conditions satisfied? Because here they didn't give the reports until after the proceeding, after the appeal determination. You complain about that. You're looking quizzical. You do complain about that in the brief, right? Yes, yes. That's what I read. Okay. So if that is true, what I'm saying is are either one of those conditions satisfied? Those conditions are satisfied because the appeal denial was based entirely upon the reports of Dr. Blaser and Dr. Duff. Those obviously were obtained after the appeal was filed. Audra Easter never got a chance to respond to them. That's particularly important in this case because they purport to report specific comments of Easter's medical providers that were crucial in the decision, and yet Easter and her medical providers never got an opportunity to respond to them. One other thing I'd like to say about the Medgar case, Your Honor, and obviously the parties have a different opinion on that, but in the portion of the Medgar case that Easter relies upon, there's a citation of this court's prior decision in the Sage case, and in the Sage case it talks about the requirements for full and fair review under ERISA, and one of those requirements is the requirement that the claimant be allowed to respond to the evidence brought by the Planned Administration. All right. Thank you, Counsel. Good morning, Your Honors. Good morning. Jack Demingler, Jr., on behalf of Hartford Life and Axne Insurance Company. I'll begin by addressing what's before the court, and Judge Holmes, you've already hit the nail on the head when it comes to this. Under the arbitrary and capricious standard of review, the issue is whether Hartford reasonably based its determination on substantial evidence, and this court has repeatedly defined substantial evidence as more than a scintilla, and the arguments that Ms. Easter has presented in the briefing and now today in the court really have the tenor of what was proven. Well, it's not a matter of what was proven. This court just has to assess the reasonableness. If it could be stated succinctly then, what is the factual theory that would support that more than a scintilla? In other words, what would be their theory for denying the claim? It's set out very clearly in the appeal determination letter, Your Honor, and Hartford cited the evidence about the medical examinations. Hartford in particular noted the comment of Ms. Jones about her belief that the psychiatric conditions were the primary cause of the problems. It cited Ms. Sandy's comment that the evidence of the physical conditions standing alone didn't explain the severity of the symptoms that Ms. Easter was complaining about. It cited the evidence of Dr. Duff's neuropsychological evaluation where, first of all, he said that the evidence seemed to indicate that there were no true cognitive deficits, but that it was difficult to say because of the subjective evidence of extreme exaggeration of symptoms, including the exaggeration of fatigue, which ties in with the psychiatric issues again. It cited Dr. Blavis' peer review report where Dr. Blavis had found that the clinical evidence relating to two of the three things on which Ms. Easter based her claim, the hypersomnia and the obstructive sleep apnea, didn't exist to support the disability. So they went right down the list of all these things and they ticked it off. And all those pieces of evidence that I just mentioned that are in the appeal determination definitely are more than a scintilla of evidence on which Hartford could base its determination that the evidence didn't support disability for any of the physical conditions, and in particular the CFS. Okay, so you go with all of that evidence and Hartford ticks that off and has that evidence. What helped me with this, my recollection is there was little, by the way, of somebody definitively saying that CFS is the cause of this problem. Sandy seems to allude to that, but is there anything more than that? There is not, Your Honor. Ms. Sandy does state that she believes the CFS is the cause of an impairment in some way, but she doesn't really specify the way in which it creates the impairment. And then Ms. Sandy qualifies her own opinion through a conversation with Dr. Blavis, where she said that the physical conditions, and that would encompass the CFS, didn't explain the scope of the symptoms. And that fits in then with the findings of Dr. Duff in the neuropsychological evaluation about this extreme exaggeration of symptoms. And there's no dispute about the diagnosis of CFS. The dispute is whether the CFS creates a functional impairment severe enough to cause her to be disabled, and there certainly is evidence in the record to raise questions about that. There is not this significant, unimpeachable evidence that Ms. Easter's counsel argues exists. It's just not there. There is no clear evidence of a hard and fast evidence of the disability, and more importantly, there definitely is this evidence in the record to raise questions about what the cause of it is. And remember, there's no dispute that Ms. Easter is disabled due to these psychiatric conditions, and those conditions were not covered because they were preexisting. She didn't dispute that determination. And we have evidence here based upon the comments of both Ms. Jones and Ms. Sandy that there's more here than the physical conditions would explain. And then we have Dr. Duff's findings with this exaggeration aspect. Do you have enough evidence without Dr. Duff and Dr. Blavis? Yes. So you would stand on just her own physician's reports or descriptions of her medical condition? We could, Your Honor, yes. Because those examination reports, they don't contain the sort of evidence that definitively would state that CFS or any of these conditions would prevent her from working. Okay, so let's say that's true, but we know you didn't just rely on those. You went ahead on appeal and received two additional expert opinions, but you didn't give her the opportunity to dispute the methodology they used or to present her own contradictory evidence to what they said. So doesn't that create a procedural problem for you then? Not under the procedures that were in existence at the time of this determination. There were no regulatory requirements in the ERISA regulations that required this sort of thing. Now the regulations have changed, but those regulations were not in effect at the time of this decision. And Metzger, which arose during the argument of Mr. Grimes, doesn't require, wouldn't have required at that time providing those reports as we should in our briefing. Well, it arguably would under two conditions. One, that there was new information that came out that supported the appeal determination, or two, there are novel theories that were put forward. So that begs the question that I'd like you to answer. Why weren't the two reports, the Duff and the Blavis, why couldn't they be viewed as new information that would fit into that bucket of Metzger that would require prior disclosure and opportunity to rebut? Independent peer review reports like those of Dr. Blavis and Dr. Duff were required by the ERISA regulations in an appeal. If there were a medical issue, then an administrator such as Hartford was required to get those reports. That's a given. And what Metzger was dealing with was in that regulatory context, the argument was being made by the claimant that we have to get those reports to be able to rebut them. And this court very clearly said in Metzger, no, we're not going to have this circularity here which would lead to an endless chain of rebuttal and new reports and rebuttal. We will draw the line. And that was the very clear holding of Metzger, and that applied to these sorts of peer review reports. Because if you took a broader approach than that, then every case would have involved that rebuttal because every ERISA case with an appeal, which is every ERISA case, would require these peer review reports. Now, you've noted, Your Honor, correctly, that there was what I would consider dicta in Metzger where it said if these situations existed, then maybe there's an exception. But those two things don't apply here because neither Dr. Blavis nor Dr. Duff had a new diagnosis. Neither of these reports had a new diagnosis. Well, they, I mean, they take it a bit further, don't they? I mean, her own physicians may have suggested an inability to connect the dots, but Dr. Duff basically said she was malingering. So he took it, I mean, it's not, it is new. It's not the same as what you had before. And before you answer that, let me just throw one more thing out. What concerns me about your position is that in every case on appeal, on the appeal stage, you could go get a couple of IMEs and say, oh, our doctors that we got the IME from refute this. And so, therefore, we've got conflicting evidence. We're going to go with them. She doesn't need and isn't entitled to a chance to rebut, so we deny. I mean, couldn't that happen in every case? Couldn't you actually seal the fate of the claimant in every case by doing that? In that scenario, yes. If you assume that the reports find that the evidence does not support an impairment resulting in disability. But that doesn't get into what I've called the dicta of Metzger. Because the system, Your Honor, at this time, and it's changed, as I mentioned, but the system at this time was an administrator gets these reports and is entitled to rely upon those reports. And this court in Metzger was very clear that obtaining these peer review reports, if those peer review reports supported the determination that there was no disability, that did not ring the bell for a rebuttal. And what the reports of Dr. Blavis and Dr. Duff did was analyze the information and arrive at conclusions on which Hartford relied in the appeal determination. But they did not get to the level of something under the dicta of Metzger that would have warranted giving a response. I mean, Dr. Duff discussed the three conditions on which Ms. Easter had based her appeal, hypersomnia, obstructive sleep apnea, and CFS. And on the first two, he said, I can see the evidence and it doesn't support a functional impairment. On the third, CFS, he said, I don't know. And that led to Dr. Duff's report, because Hartford said, being a reasonable administrator, all right, we don't have a decision yet, we don't have the evidence on CFS, so let's go to Dr. Duff. And Dr. Duff came up with the report that found conflicting evidence about the cognitive deficits and it found this evidence of exaggeration, which fit in with what is already in the record about the comments of Ms. Sandy, for example, about the physical complaints not matching up with the subjective complaints of her. But Dr. Duff didn't get a definitive determination on CFS either. So, again, they didn't have one, right? Well, they didn't have a definitive determination on the scope of functional impairments attributable to it. Attributable to CFS. Right. But there was enough evidence, I would submit, to constitute evidence on which Hartford could rely that the evidence didn't establish that impairment. Did not establish it. Yes. Okay, this is sort of a technical question, but I want to be clear on this. On page 20 of your brief, you offer a rationale for why procedural regularity exception actually is limited to these two areas, no decision, delayed decision. But you cite an id, and there are three cases above the id. And so which one are you talking about? Which one are you relying on? Because it's important. Because, I mean, one can argue that that procedural regularity exception is not so limited, and there are cases that argue that. So what's your strongest case for that limitation and that rationale in particular that you cite? Yeah, look at my brief. Yes, please do. Help me. 20. Page 20. Well, the id refers to all three, Your Honor. Okay, that's really helpful. Let me be clearer than my id, if I may. Please. The three cases I cited, Lassmar, Kellogg, and Gilbertson, all fall into this, what I characterize as the narrow category of either no appeal or an appeal so dramatically late that the Court has said this has to be a substantial irregularity. Those are the cases that the only type of case this Court has used to find a procedural regularity. Yes, and you can say only kind of case that has held that. But you went further, and interestingly, on page 20, in explaining this is why this procedural regularity is only limited to these two kinds of cases, offering a rationale for putting our cases together. And I like harmonizing rationales. So what I'm trying to get at is which one of those, do any of those cases do anything more than hold that procedural regularity in that case applies, or do they offer the rationale that you give us on page 20? Well, I would, actually, there are two other cases that are cited here. I mean, I can read them, but the point of them, go ahead. I'm sorry, Your Honor. No, I'm sorry. I would direct the Court to the MK versus Visa Cigna Network case that's cited on the bottom of page 20. That's a case where the plaintiff, it's one of my cases, the plaintiff made arguments similar in tenor to this case, saying there are various things that are procedural regularities. We argued no, the Court's limited it in scope, and the Court agreed with our argument there that it is limited in scope and refused to expand it. And then the other case I'd note is the case at the top of page 20, Palmer versus Metropolitan Life, which is another case where this Court, in looking at its previous decisions, commented that the Court had consistently limited the scope of this exception. And if I might mention one other thing, I'm out of time, but just very quickly. In the reply brief, Mr. Grimes cites a series of circuit decisions implying that those decisions support his argument for switching arbitrary and capricious to de novo, and not a single one does, which fits in with our position. He cites the Fott case of this Court. That's about the old sliding scale that the Supreme Court in Glenn abrogated, and it didn't involve transferring to de novo. He cites the Martinez case of this Court, the Kent case of the Sixth Circuit, the Donato case of the Seventh Circuit, the Booten case of the Ninth Circuit. None of those cases involved transferring over to de novo because of the procedure. Okay, I let him run over a little, but you're at 240 now, so wrap it up, please. Your Honor, unless you have other questions, I'm finished. Thank you. Thank you. Case is submitted.